The **RESOLUTION TRUST CORPORATION** as Receiver for Unifirst Bank for Savings, A Federal Savings and Loan Association, Plaintiff,

v.

**Tom SCOTT, Jr., Defendant.**

**Civil Action No. 3:94–CV–159BN.**

United States District Court,
S.D. Mississippi,
Jackson Division.

May 30, 1996.

---

Jack F. Dunbar, John H. Dunbar, Holcomb Dunbar, Oxford, MS, for Tom B. Scott, Jr.

Tylvester O. Goss, Davis, Goss & Williams, Jackson, MS, Lori Williams Holland, Lori Williams Holland, Attorney, Jackson, MS, Walter M. Jones, Wyatt, Tarrant & Combs, Louisville, KY, Thomas R. Dyer, Robert E. Craddock, Jr., Wyatt, Tarrant & Combs, Memphis, TN, for F.D.I.C.

## OPINION AND ORDER

BARBOUR, Chief Judge.

This cause is before the Court on the following motions which were filed by the Defendant, Tom Scott, Jr. ("Scott"): (1) Motion for Summary Judgment and for Partial Summary Judgment on Counterclaim; (2) Motion to Strike Plaintiff's Expert Reports Submitted in Opposition to Scott's Motion for Summary Judgment; and (3) Motion to Strike Inadmissible Proof. Having considered the Motions, Plaintiff's Responses, Defendant's Rebuttals, all attachments to each, and supporting and opposing memoranda, the Court finds that (1) the Motion for Summary Judgment and for Partial Summary Judgment on Counterclaim is well taken and

should be granted; (2) the Motion to Strike Plaintiff's Expert Reports Submitted in Opposition to Scott's Motion for Summary Judgment is well taken and should be granted; and (3) the Motion to Strike Inadmissible Proof is not well taken and should be denied. Because the disposition of these motions closes this case, all other pending motions are moot and therefore denied.

## I. *Factual Background and Procedural History*

### A. *Procedural History*

On August 10, 1989, the Office of Thrift Supervision ("OTS") appointed the Resolution Trust Corporation ("RTC") as receiver of Unifirst Bank for Savings, F.A. ("Old Unifirst").[1] On that same date, RTC organized Unifirst Bank for Savings, A Federal Savings and Loan Association ("New Unifirst"), for the purpose of taking over at least some of the assets and liabilities of Old Unifirst. To accomplish this purpose, the RTC as receiver for Old Unifirst entered into a Purchase and Assumption Agreement ("the Agreement") with New Unifirst which provided, *inter alia,* for the transfer of certain assets and liabilities from Old Unifirst to New Unifirst.[2] Finally, on that same date, the OTS appointed the RTC as conservator for New Unifirst.

On June 15, 1990, the OTS appointed the RTC as receiver for New Unifirst, and the RTC succeeded to all rights, powers and privileges of New Unifirst, its directors and officers. Pursuant to a contract of sale between the RTC as receiver for New Unifirst and the RTC in its corporate capacity ("RTC Corporate") dated June 29, 1990, the RTC as receiver assigned to RTC Corporate all of its right, title and interest in the claims of New Unifirst. RTC Corporate was thereafter the lawful owner of such claims until December 31, 1995. On that date, RTC Corporate ceased to exist in accordance with the provisions of the Resolution Trust Corporation Completion Act, 12 U.S.C. § 1441a(m)(1) and (2), and the assets and liabilities of RTC Corporate were transferred to the Federal Deposit Insurance Corporation ("FDIC"), which serves as the manager of the Federal Savings and Loan Insurance Corporation ("FSLIC") Resolution Fund. By Order dated April 29, 1996, this Court granted the Plaintiff's Motion to substitute the FDIC as the Plaintiff in this matter.[3] The Court noted in that Order that "the FDIC, as an assignee of the claims of the RTC, will be subject to the same affirmative defenses and counterclaims as was the RTC." April 29, 1996, Order at 3.

On March 22, 1994, the RTC as receiver for New Unifirst filed this action against Scott alleging damages as a result of Scott's alleged breach of his contractual obligations and fiduciary duties as a director and officer of Old Unifirst. The RTC further alleged causes of action for gross negligence, negligence and negligence *per se* for the manner in which Scott discharged his duties as a director and officer of Old Unifirst. The Amended Complaint filed on September 2, 1994, charges that Scott caused Old Unifirst to incur damages as a result of three transactions: Manhattan/Bismarck;[4] DMI Investment Corporation; and the Mountain Creek Participation. On December 15, 1994, the parties submitted a Stipulation of Dismissal of DMI Investment Corporation Claims in which the RTC voluntarily dismissed all claims concerning DMI Investment Corporation. By letter dated March 19, 1996, from counsel for the RTC to counsel for Scott, the RTC withdrew all claims concerning the Mountain Creek Participation.[5] Further-

---

**1.** The Court may refer to Old Unifirst simply as Unifirst in subsequent portions of this opinion.

**2.** The specifics of the Agreement will be addressed in a subsequent portion of this opinion addressing the indemnification issue.

**3.** To avoid any unnecessary confusion, the Court will refer to the Plaintiff in this matter as the RTC. Where necessary, the Court will distinguish between the various roles occupied by the RTC since August 10, 1989, the date the RTC became the receiver for Old Unifirst.

**4.** This transaction may be referred to in this opinion as any of the following: the Manhattan/Bismarck transaction; the Manhattan transaction; or the Westchase/Westview transactions.

**5.** The Court notes that the Motion for Summary Judgment filed by Scott also contained a Motion for Rule 11 Sanctions against the RTC for its continued prosecution of claims arising out of the Mountain Creek Participation. Scott withdrew the motion for sanctions because he had failed to serve the motion on the RTC prior to filing such motion with the Court as required by

more, this Court has previously dismissed the RTC claims for relief based upon the theories of breach of contract, breach of fiduciary duty, negligence and negligence *per se.* *See* June 8, 1995, Opinion and Order. Therefore, the only remaining claim of the RTC against Scott is a claim for gross negligence for Scott's actions concerning the Manhattan/Bismarck series of transactions.

On June 24, 1994, Scott filed his Answer to the Complaint of the RTC and asserted a counterclaim for indemnity based upon an indemnification resolution passed by the Board of Directors of Old Unifirst. Scott prayed for a judgment against the RTC, as receiver for New Unifirst, entitling him to recoup and to offset any award obtained against him as a result of the underlying action and adjudging the RTC liable for attorneys' fees and expenses incurred by him in defending this action. By Order dated April 18, 1995, this Court denied the RTC Motion to Dismiss the Counterclaim for indemnification asserted by Scott. On November 27, 1995, Scott filed an action against the RTC as receiver for Old Unifirst asserting the same claim for indemnity raised in his counterclaim against the RTC as receiver for New Unifirst. *Scott v. RTC,* Civil Action No. 3:95cv856BN (Nov. 27, 1995). In that Complaint, Scott asserts that "[e]ither the RTC/Unifirst [6] owes the indemnity obligation or both RTC/Unifirst and RTC/New Unifirst owe it." Complaint at 5, ¶ 18. By Order dated February 15, 1996, that action was consolidated with the present action for all purposes and subsequent proceedings.

Scott has now filed a Motion for Summary Judgment concerning the only remaining claim of the RTC regarding Scott's alleged gross negligence in his actions concerning the Manhattan/Bismarck transaction. Scott has also moved for summary judgment on his counterclaim for indemnity for the RTC.

### B. *Industry Background* [7]

In the early 1980's, most savings and loan associations or "thrifts", including Old Unifirst, held the majority of their assets in long-term, fixed-rate mortgages, reflecting loans made in local markets for homes. These home loans were financed by deposits in the form of savings accounts made primarily by local depositors. These thrifts were statutorily limited by the federal government regarding the rates that they could pay on deposits. The funds from deposits were loaned to homeowners at higher mortgage interest rates, resulting in solid profits for the thrifts as long as residential mortgage rates remained somewhat higher than the rates paid by the thrifts for deposits.

From the late 1970's through the early 1980's, interest rates soared, and the market value of fixed-rate residential mortgages on the books of the thrifts plunged. Because the thrifts were limited by federal law to paying below-market rates on deposits, many depositors withdrew their money to invest these funds with other types of institutions paying higher rates of return. Federal laws were changed to allow the thrifts to pay higher rates on deposits, but the rates on existing mortgages, which comprised the bulk of the thrifts' assets, remained low. These fixed-rate mortgages could not be sold at or near face value.

As a result of these market and regulatory forces, in 1981 and 1982, the thrift industry experienced the worst financial operating results since the Great Depression, losing nearly twenty-five percent of the industry's net book value. During these two years, one-sixth of all federally insured thrifts were merged or liquidated because of inadequate capital. Other conditions aggravated the

---

Rule 11 of the Federal Rules of Civil Procedure which provides that a motion for sanctions "shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion, ... the challenged ... claim ... is not withdrawn or appropriately corrected." Fed.R.Civ.P. 11(c)(1)(A). The RTC withdrew the claims concerning the Mountain Creek Participation within the 21-day safe harbor period.

6. RTC/Unifirst refers to the RTC as receiver for Old Unifirst.

7. The Court has taken the facts in the remaining portions under section I. from the Defendant's Itemization of Facts for Which There Is No Genuine Dispute and the Plaintiff's Response to that Itemization. Where necessary, the Court has attempted to reconcile the positions of the parties without making any material factual determinations which would usurp the function of the jury.

problems being experienced by the thrifts including the oil and gas boom of the late 1970's and early 1980's which soon came to an end and the passage of the Tax Reform Act of 1986 which eliminated certain previously advantageous tax deductions.

The federal government responded to the problems of the thrifts by loosening the capital requirements of the thrifts and seeking ways to strengthen the capital and management of the thrift industry. Thrift policies and procedures for real estate appraisal were revised to help clearly define market value and to give the thrifts more flexibility to restructure problem loans. Specifically, the Federal Home Loan Bank Board ("FHLBB") [8] developed a forbearance policy concerning the thrifts which provided as follows:

> [T]he Board believes it appropriate to employ supervisory policies that will support basically sound, well-managed thrifts in weathering what is believed to be a difficult but temporary period. Implementation will be accomplished by *encouraging thrifts to work with their troubled borrowers;* by establishing a capital forbearance policy; and by reaffirming that generally accepted accounting principles can be used to permit loan restructuring without loss recognition, where appropriate.
>
> In response to this situation, *the Board encourages thrifts to develop work-out strategies with their troubled borrowers* in appropriate situations. Entering into work-out plans with borrowers who are experiencing temporary difficulties in meeting their debt service obligations is often in the best interests of all parties. Although examiners will point out to managements the weaknesses that may be present in loans, *the Board does not auto-*

*matically require foreclosure* on collateral or acceleration of the maturity of loans. The Board recognizes that downturns in certain sectors of the economy are expected to be transitory. *Therefore, lenders may find that the most prudent policy is to restructure loan terms rather than to take more precipitous action, such as foreclosure.*

Stewart Report at 21–22 (quoting 2/26/87 FHLBB Policy Statement on Forbearance, 52 Fed.Reg. 6876 (3/5/87) (emphasis added)). The FHLBB also loosened the requirements with regard to property appraisals:

> Although the Board recognizes the importance of an appraisal, it believes the value of collateral should not be the sole determinant of asset valuation where, for example, the borrower has other resources for repayment against which the lender has legal recourse.

Stewart Report at 23 (quoting 53 Fed.Reg. 338, 350 (1/6/88)).

Another regulatory response to the thrift crisis was the Management Consignment Program where managers believed to be proven were placed into failed and failing thrifts to help manage their problem assets and contain staggering operating losses. Scott was one of many managers who was asked to assist the FHLBB in this manner.[9] Some insolvent institutions were permitted to operate for months or years if the FHLBB supervisory staff believed that such institutions had good management. The thrift problem was so pervasive that the FHLBB did not have the resources, and the FSLIC did not have the money, to take over every insolvent, federally insured thrift.

---

8. The FHLBB had examiners in twelve district offices, including the Dallas, Texas, district office which was responsible for regulating Mississippi institutions. The FHLBB examiners made periodic examinations of all "FSLIC-insured financial institutions to review the institutions' operations, activities and books and records to determine regulatory compliance and safety and soundness." Expert Witness Report of Rosemary Stewart at 4, attached as Exhibit G to Scott's Motion for Summary Judgment (hereinafter "Stewart Report").

9. Scott was Chairman of the five-man board appointed by the FHLBB for Vernon Savings & Loan in Texas and also served as President and Chief Executive Officer of that institution. The RTC asserts that Scott's selection by the FHLBB may have been based upon his contacts in the industry, rather than his proven experience, because Old Unifirst had already suffered capital deficiencies prior to Scott's selection. The RTC offers no proof to support this contention.

Other federal regulations were revised [10] to allow the thrifts to sell their residential mortgage portfolios at a loss and defer the loss over several years by charging only a fraction of the deferred loss against income each quarter, instead of charging off all of the loss at one time. Scott asserts that the reason for this regulatory change was to prevent the thrifts from having to recognize book-value insolvency. The RTC asserts that the reason for allowing this loss deferral was to allow the thrifts to reinvest the loan sale proceeds in higher earning assets. In either case, Old Unifirst elected to sell its residential mortgage portfolio and defer the loss as allowed by the new regulations.[11] The deferred loss amounted to a charge against income of approximately $600,000 each quarter. Obviously, Old Unifirst needed substantial income to offset this loss each quarter.

The Garn–St Germain Depository Institutions Act of 1982 was enacted in substantial part to permit thrifts to operate more like commercial banks. Also, the FHLBB revised its regulations and policies to permit investment by thrifts in higher-yielding, shorter-term, more geographically diverse consumer, commercial and construction loans and other transactions previously considered appropriate investments for commercial banks. Although Unifirst had some experience in commercial lending and finance, it lacked any commercial banking expertise as most of its loan officers had spent their careers underwriting residential mortgage loans. Unifirst retained the executive recruiting department of Peat Marwick to seek out the "best and the brightest" commercial bankers available to provide Unifirst with the commercial banking expertise which it lacked. The employment of Jeb Cloyd, as Chief Operating Officer, and David Guthrie,

as Chief Loan Officer, was the result of these recruiting efforts.

### C. *Structure and Chain of Command of Old Unifirst*

Unifirst, as a mutual organization operating under a federal charter, had no shareholders. The institution was "under the direction of a Board of Directors" ("Board"). Federal Mutual Charter at A–2 (hereinafter "Charter"), attached as Exhibit A to the June 27, 1984, Minutes of the Regular Meeting of the Board of Directors (hereinafter "June 27, 1984, Minutes"), attached as Exhibit I to Scott's Motion for Summary Judgment. The Board was elected by the depositors, which had "any and all of the powers of the savings bank not expressly reserved by the Charter to the members." Bylaws at B–5, attached as Exhibit B to the June 27, 1984 Minutes. A majority of directors constituted a quorum, and the act of a majority of directors at a meeting at which there was a quorum was the act of the Board. *Id.* at B–3. The Bylaws authorized committees of the Board, including an Executive Committee, to exercise the powers of the Board between meetings. *Id.* at B–4. The Bylaws also authorized the Board to elect "a president, one or more vice-presidents, a secretary, and a treasurer," whose terms of office were for one year. *Id.*

From 1984 to 1989, Unifirst was the largest thrift in Mississippi, with over $865 million in assets, 24 branches in 14 cities and 475 employees. Unifirst had at least 12,000 loans of various types and at least 60,000 savings accounts. Scott could not be and was not directly involved in every transaction at Unifirst during this period. Scott asserts that he had no direct, day-to-day responsibility for the details of the Manhattan transaction, and that such details were left to a myriad of loan officers, vice-presidents, senior vice-presidents and finally executive vice-

---

10. Jeb Cloyd, the Chief Financial Officer for Old Unifirst from Spring, 1984, through 1988, testified that the federal regulations during this period of time were in constant flux, and that when a new regulation was promulgated, it was not always clear how to interpret the regulation or how the regulation applied to a given situation. Cloyd Dep. at 218, attached as Exhibit S to Scott's Motion for Summary Judgment.

11. The RTC disputes that Unifirst was encouraged by the FHLBB to elect this loss deferral. However, an internal FHLBB memorandum after the 1987 examination of Unifirst states that "Unifirst followed the FHLBB's suggestion to sell these low-rate assets for a loss and then defer the loss over a number of years." Stewart Report at 17 (quoting 5/10/88 Memorandum from Kielborn and Case to Barclay at 1–2).

presidents which are the only persons who reported to him. The RTC asserts that Scott's authority and responsibility regarding the Manhattan transaction was not limited to broad administrative responsibility, and that as a member of the Executive Committee and as President of Unifirst, Scott had responsibility for "taking corrective action insuring legal compliance and advising his Board of Directors of all relevant facts impacting any decision in regard to these transactions." Plaintiff's Response to Defendant's Itemization of Material Facts at 6, ¶ 69.[12]

The parties do not dispute that as President, Scott had management oversight of every aspect of the Unifirst organization, from deposit acquisition to the management of employee benefits to the purchase of office supplies. Scott also had responsibilities as one of ten members of the Board of Directors and as one of six members of the Executive Committee of the Board. Scott was not Chairman of the Board.

The accounting firm of Peat Marwick audited Unifirst on a regular basis. Unifirst also had a compliance officer, who reported directly to the Audit Committee of the Board, charged with ensuring that Unifirst complied with applicable laws and regulations. The Audit Committee included and was chaired by outside directors. The Board of Directors required the attendance of the General Counsel for Unifirst, Tom Scott, III, ("Scott, III")[13] at every meeting.

In accordance with the structure outlined above, the process for prior approval of any transaction in excess of $1,000,000 usually began at the level of one or more vice-presidents, who then made recommendations to senior vice-presidents. These senior vice-presidents then made recommendations to the executive vice-president for the department involved in the transaction, who would then review the transaction. This series of recommendations and reviews usually occurred through the work of officer committees. After approval by the appropriate officers, the officers recommended approval by an appropriate committee of the Board. If the Board Committee approved of the transaction, such approval was then reported to the Board.[14] Scott asserts that this review procedure was followed with regard to the Manhattan transaction which is the only transaction being questioned in this case. The RTC contends, however, that the direction came from the top, specifically from Scott, and that Scott had the authority to reject a transaction at any point prior to approval.[15] The RTC agrees, however, that Scott had no individual authority to approve the Manhattan transaction,[16] which required approval by a proper committee of the Board and/or the full Board. On both the Executive Committee and the Board, Scott possessed one vote concerning the approval of the loans for the Manhattan transaction.

The Board and its Executive Committee included outside directors who were independent and respected businessmen. General Louis Wilson, a member of the Executive Committee, was a former Commandant of the Marine Corps, a member of the Joint Chiefs of Staff, winner of the Congressional Medal of Honor, and a member of the Board

12. As Scott notes in his Memorandum of Authorities in Reply, the RTC has offered no citation of legal authority to support its proposition that Scott owed a duty to the Board to disclose any "negative" information concerning the Manhattan transaction. Memorandum of Authorities in Reply at 15–16.

13. Tom Scott, III, is the son of the Defendant, Tom Scott, Jr.

14. The RTC has not sued any of the vice-presidents who analyzed the details of the Manhattan transaction and who wrote the recommendations for the approval of the Board.

15. The RTC cites to the deposition of Jeb Cloyd to support its contention that Scott directed the Manhattan transaction from the top rather than following the procedures normally used by Old Unifirst with regard to such loans. However, the Cloyd deposition only supports the proposition that Scott did not want to recognize a loss on the Manhattan transaction. *See* Cloyd Dep. at 38–44, attached as Exhibit S to Scott's Motion for Summary Judgment. Cloyd's testimony does not support the RTC contention that the other officers of Unifirst acted only at the direction of Scott in performing their respective functions with regard to the Manhattan transaction.

16. The Board promulgated a loan policy for officers limiting the amount which one officer could approve to $1,500,000 in the aggregate for secured real estate loans.

of Directors of Merrill, Lynch, Flour Corporation, Louisiana Land and Exploration and Jackson Redevelopment Authority. James Campbell, a member of the Executive Committee, was President of Mississippi School Supply and was a member of the boards of directors for Trustmark National Bank and BellSouth. Don Lutken, President of Mississippi Power & Light, and Dr. Harvey Johnston, a respected Jackson surgeon, were also on the Board.

### D. *Manhattan/Bismarck Project*

The cast of characters in this case is quite extensive. The following is a list of these persons and a brief description of the role that each played with regard to the circumstances giving rise to this litigation.

- Tom Scott, Jr.: President and Chief Executive Officer of Old Unifirst and a member of the Board of Directors and of the Executive Committee of that Board. Scott voted to approve the series of loans for the Manhattan transaction.

- Tom Scott, III: General Counsel to Old Unifirst and the son of Tom Scott, Jr. Scott, III, was also in favor of making the loans for the Manhattan transaction and was intricately involved in working with various Unifirst officers concerning the details of those loans.

- Jeb Cloyd: Employed as Chief Financial Officer by Old Unifirst in March or April, 1984, as a result of the efforts of Peat Marwick to find the "best and the brightest" commercial bankers for Old Unifirst. His responsibility was to enhance the capital position of Old Unifirst, and he reported directly to Scott.

- David Guthrie: Employed as Chief Lending Officer by Old Unifirst in June, 1987, as a result of the efforts of Peat Marwick to find the "best and the brightest" commercial bankers for Old Unifirst. Guthrie reported directly to Cloyd and was one of three authors, along with Cloyd and Scott, III, of a May 3, 1988, memo to the Board which recommended increasing the loan on the Manhattan transaction to $15,775,000, in order to complete the rehabilitation of the project. Guthrie was also on the Special Assets Committee which was re-

sponsible for handling the Manhattan transaction on a day-to-day basis.

- J. Sessions Roland, III: Employed by Old Unifirst in July, 1984, as a loan trainee, directly out of college. Roland was eventually promoted to Manager of the Commercial Loan Department in August, 1989, and received the title of Vice–President at that time. Until then, Roland reported directly to Shelton McKay, who was also a Vice–President. Roland was on the Special Assets Committee which was responsible for handling the Manhattan transaction on a day-to-day basis.

- Raymond Miller: Employed by Unifirst, Inc., a subsidiary of Old Unifirst, in late 1985, to participate in various projects involving real estate acquired for profit and properties acquired by Old Unifirst through foreclosure, i.e., REO (real estate owned). Miller became the head of the REO Department when it was created in 1986 or 1987. Miller, accompanied by architect, Rick Barron, traveled to New Orleans to view the Westchase property in September, 1986, and provided a rough estimate for rehabilitation of the entire project. Miller was also on the Special Assets Committee which was responsible for handling the Manhattan transaction on a day-to-day basis.

- Bill Huddleston: A Senior Vice–President at Old Unifirst who began his tenure there in January, 1958, and was responsible for accounting and data processing. Huddleston reported directly to Scott, and also served as a member of the Board of Directors, as the Secretary of the Executive Committee and as a member of the Loan Committee.

- Ronald Benitez: Real estate developer in New Orleans who developed the Manhattan/Bismarck project through his company, Manhattan Limited Partners.

- Stewart Juneau: Real estate developer who was an associate of Benitez and who participated heavily in the negotiations concerning the Manhattan transaction. Juneau met repeatedly with officers of Old Unifirst concerning the Manhattan transaction but never met Scott until the

day of Juneau's deposition in January, 1996.

Unifirst had struggled with the Westchase Apartments (a/k/a Manhattan/Bismarck Apartments) for approximately fourteen years by 1987. Unifirst made the original long-term loan on the developed apartment complex in 1973. The Board was therefore aware of the history of this property before the transactions which are at issue in this case took place. Unifirst foreclosed on the property in 1985 after the owners filed for bankruptcy. At foreclosure, the loan balance was approximately $3,950,000. An appraisal of the property in 1985, in connection with getting the property released from bankruptcy, valued the property at $4,185,000. At this point in time, the property was in extremely poor condition, and most of the units were vacant. The structures on the property were continuing to deteriorate, and most were uninhabitable.

The full amount of the Unifirst investment in the property was classified as a scheduled item while the property was in bankruptcy and later in 1985 when Unifirst foreclosed.[17] The officers and directors of Unifirst began to consider various alternatives for dealing with the Manhattan property. The officers obtained a signed contract from Riley Stogner[18] to buy the property for $4,185,000 subject to obtaining financing. This contract fell through when it became clear that Stogner could not obtain the necessary financing to pay for the property.[19]

According to Scott, remaining in possession of the property was not a desirable option. The RTC asserts that holding the property and recognizing the loss was a more desirable option than the course of conduct pursued by Unifirst. However, the RTC agrees that after repossession of the property, the potential for additional loss to Unifirst, as the mortgagee in possession of the property, was a reality. Furthermore, insurance was difficult to obtain due to the number of uninhabited buildings. Unifirst was also concerned with securing the uninhabited units because of the potential for harm to young children who lived in the complex and neighborhood.[20] In March, 1986, one resident claims that he fell from the second story balcony and suffered severe injuries. This resident later sued Unifirst for over $800,000, and the insurance carrier canceled coverage.[21] Along with the issues of insurance and liability, *ad valorem* taxes and utility bills continued to accrue as the property further deteriorated.

After the sale to Stogner fell through, Unifirst began to analyze the cost of renovating the property. Ray Miller, along with architect, Rick Barron, inspected the property in September, 1986, and concluded that the roofs would begin to cave in within a year and a half to two years unless some prompt action was taken to preserve the asset. Mil-

17. If an asset was classified as a "scheduled item," the minimum regulatory capital requirement of the institution had to be increased by 20% of the value of the asset. FHLBB Classification of Assets Rules at 2–3, attached as Exhibit D to the Stewart Report. The scheduled item system was eliminated by the Competitive Equity Banking Act ("CEBA"), August 10, 1987, which directed the FHLBB to establish an asset classification system consistent with the systems used by the federal banking agencies. *Id.* at 2.

18. Both parties refer to a Mr. Spofford who was supposedly involved in the contract to buy the property along with Stogner. The contract only lists Stogner as a buyer. Ex. 51 to Plaintiff's Response. Therefore, the Court will refer only to Stogner as a buyer.

19. According to Cloyd, the contract was pursued for at least six months. Cloyd Dep. at 66. The RTC asserts that the contract fell through in July, 1986, after an investigation by Shelton McKay revealed that the buyer had no assets and would not be able to obtain financing. *See* 8/10/89 McKay Memo, attached as Exhibit H to Plaintiff's Response (setting forth McKay's recollection of the time frame of events in 1986).

20. Again, the RTC asserts that securing the premises was only an issue because Unifirst refused to recognize the loss on the property by either selling the property at its value below investment or vacating the few remaining habitable apartments and securing the premises. The Court notes that even if all the units were vacant, securing the premises would be a concern for the owner of the property in order to prevent anyone, not just the inhabitants of other units in the complex, from coming onto the premises.

21. Neither party has informed the Court of the outcome of this suit.

ler Dep. at 126, attached as Exhibit R to Scott's Motion for Summary Judgment. Miller also reported that renovation of the project would cost approximately $10,000 per unit. *Id.* at 38–43. Miller stressed that the figure was only a rough estimate.

Unifirst then began communicating with Ronald Benitez, a New Orleans real estate developer, concerning a proposal for renovating the property. Benitez became interested in the property because of several positive trends which were occurring in Harvey, Louisiana, where Westchase was located. Juneau Dep. at 14–20, attached as Exhibit D to Scott's Motion for Summary Judgment. Harvey is considered a part of the New Orleans metropolitan area and is known as the West Bank. A new bridge was being constructed across the Mississippi River which would connect the West Bank directly to downtown New Orleans. Benitez and Juneau believed that the new bridge would create a demand for apartments on the West Bank which had not previously existed. Also, Manhattan Boulevard, the street on which Westchase was located, was being widened from two to four lanes, as part of a major commitment by the City of Harvey. The City wanted Manhattan Boulevard to serve as a major artery to feed major retail traffic corridors on the West Bank. Presumably because of this commitment by the City to widen Manhattan Boulevard, several major retail and public construction projects were beginning, including a Sam's Superstore, a post office and a library. *Id.* The developers had also heard that the apartment complex across the street, Westview, was going to be redeveloped. *Id.* at 58. For these reasons, Benitez began to try to buy Westchase from Unifirst.

Benitez made a proposal that Unifirst loan him the money to buy the Westchase property ($4.2 million) and that he be advanced an additional $1 million to begin rehabilitation of a limited number of units. The plan was for Benitez to seek other methods of financing, such as tax-free bonds, to pay off the loan to Unifirst after only limited renovation was completed. The Executive Committee adopted this proposal on March 18, 1987. Scott, as a member of the Executive Committee, had one vote concerning this loan. The minutes of that meeting state that "[i]t is the intent of the purchaser to seek financing through the issuance of tax exempt bonds as rehabilitation proceeds." March 18, 1987, Minutes of Executive Committee, attached as composite Exhibit L to Scott's Motion for Summary Judgment.[22] The full Board reviewed the transaction at its regular meeting on March 25, 1987. Thus, the property was sold to Benitez for a $4.2 million promissory note secured by the property, and a $1 million dollar construction loan was advanced to Benitez for the rehabilitation of three of the twenty-eight buildings on the property and certain common areas. These loans were non-recourse to Benitez and were due within one year. The Executive Committee and the Board knew that the loans could not be repaid within one year and that other sources of financing were intended to pay off these loans. Although Unifirst retained the risk of any decline in the value of the property, by selling the property to Benitez, Unifirst was no longer the mortgagee-in-possession, and therefore transferred its exposure for premises liability and its obligations to pay *ad valorem* taxes.[23]

---

**22.** The RTC asserts that "Unifirst entered into the transaction with Benitez prior to anyone [sic] discussing the rehabilitation of any units of the property for the purposes of assisting in securing bond financing...." Plaintiff's Response to Defendant's Itemization at 16, ¶ 187. The RTC has offered no support for this statement. As set forth in the text, the minutes of the Executive Committee meeting reflect that at least someone had raised the issue of tax exempt bond financing. In fact, Benitez had received a proposal from John B. Rucker at the Frazer Lanier Company concerning the possibility of bond financing of the Westchase project. *See* November 14, 1986, Letter from Rucker to Benitez, attached as Exhibit 34 to Plaintiff's Response. Although Cloyd did not view bond financing as a "real alternative" because of the requirement by Frazer Lanier of a 50% letter of credit to guarantee the bonds, Cloyd Dep. at 73, this option was still being pursued by Unifirst when the loan to Benitez was made.

**23.** The RTC asserts that Scott approved the initial loans to Benitez with knowledge that "no underwriting had been accomplished and that Federal Regulations had not been complied with." Plaintiff's Response at 17. Although the RTC offers no support for these allegations, the

Despite the protests of the RTC to the contrary, the record is replete with evidence that the parties did in fact pursue the option of tax-free bond financing for the Westchase project. Letters of inducement, which are necessary prior to the issuance of such bonds, were issued by the Louisiana Public Facilities Authority for the project. Benitez worked with Frazer Lanier on a plan to get the bonds issued and placed with investors. The intent of Unifirst was to get out of the Westchase project altogether as soon as alternative financing could be arranged. A portion of the loan proceeds and/or income from the property would be used to pay Benitez a management fee to oversee the construction and to manage the property. However, all other available proceeds from cash flow, the sale of tax credits, tax-exempt bonds or any other method of financing would go to Unifirst until Unifirst was paid in full with a reasonable rate of return. Juneau Dep. at 75. Therefore, in order for Benitez to reap any substantial benefits from the project, he had to get Unifirst out by paying off his loan. *Id.*

An appraisal was prepared by Real Estate Valuations and Consultants, Inc. ("REVAC") on September 28, 1987, which concluded that the market value of the property, as completed, would be $6.1 million and the investment value, as completed, would be $12 million.[24] REVAC Appraisal, attached as Exhibit M to Scott's Motion for Summary Judgment. The appraiser concluded that it was not feasible to renovate the property using conventional financing, but that it was feasible to renovate

by the issuance of tax-free bonds. *Id.* at 43; *see also* Juneau Dep. at 70. By 1987, this method of refinancing troubled real estate by the issuance of tax-free bonds was well established. Benitez Dep. at 43–45, attached as Exhibit C to Scott's Motion for Summary Judgment; Juneau Dep. at 24; Miller Dep. at 38, 166. Although the RTC disputes that bond financing was ever an option, the RTC states the following in its Response: "Admittedly, Benitez and Unifirst did turn to an exploration of tax exempt AAA rated bonds which might carry a lower interest rate." Plaintiff's Response at 26.

As renovation of the first three buildings proceeded, extensive latent defects were discovered which increased the cost of the partial renovation substantially. As a result of these defects, the contractor experienced significant cost overruns, and Unifirst finally advanced at least $2,820,000 under four commitments from March, 1987, to March, 1988, to complete renovation of the three residential buildings and common areas; work on five other buildings to prevent further deterioration; interest carry and soft costs. As soon as renovation on the first three buildings was complete, most of the units were promptly rented.

The market for unrated tax-free bonds dried up, and discussions then began concerning the issuance of AAA rated tax-free bonds. Credit enhancement was required for the issuance of such bonds including a letter of credit from Unifirst.[25] There were also discussions concerning what rights Unifirst would have in the event of a default on

Court will address these contentions in a subsequent portion of this opinion.

**24.** The $12 million figure was based on below-market financing of a 5¼% fixed interest rate for 10 years by issuing tax-free bonds, and a 30–year amortization. REVAC Appraisal. The RTC asserts that no such interest rate was available because fixed rates for such bonds at that time were at 8%. Memo of Ray Miller, attached as Exhibit 20 to Plaintiff's Response.

**25.** Again, the RTC asserts that a letter of credit would have been necessary for unrated bonds as well as rated bonds and that Unifirst never had any intention of using its assets to secure a letter of credit. The only support for this proposition in the record is the deposition testimony of Cloyd who was hesitant about the prospect of using tax-

free bonds throughout the process. The deposition testimony of other officers and the developers involved evinces a willingness to attempt to get some sort of tax-free bonds issued to help take Unifirst out of the Westchase project. The RTC also asserts that "[s]ince no bond issuer was prepared to loan [sic] more than $4.88 million on the property at that time, rated bonds were no more feasible than unrated bonds." Plaintiff's Response at 26. The Court notes, however, that throughout the discussions between the various officers and the developers, there is no evidence that the parties intended tax-free bonds to be the only method for paying off the Unifirst loan to Benitez. As will be noted in a subsequent portion of the opinion, the property was eventually financed by using a combination of federal government loans, tax credits and other creative sources of financing obtained by Benitez.

the bonds and a call on its letter of credit. The officers at Unifirst decided not to issue a letter of credit and began analyzing the feasibility of an advance by Unifirst of the funds needed to complete the Westchase renovation.

To evaluate the feasibility of complete renovation of Westchase, Unifirst retained in-house and outside architects and construction experts to inspect the property and determine alternative ways to proceed. The Unifirst officers reviewed alternatives for complete and partial razing of the buildings. Unifirst obtained two extensive analyses of the cost of construction from Dunn Construction of Jackson, Mississippi, and Vernon Weaver of New Orleans. Furthermore, the real estate market for apartments and condominiums was extensively studied and analyzed internally and by third-party consultants. Three construction bids were submitted and analyzed. After all of this study was completed, a memo to the Executive Committee, dated May 2, 1988, was prepared by David Guthrie, Jeb Cloyd and Tom Scott, III, recommending that an additional $6,880,000 necessary to complete the renovation, together with interest carry on the total balance outstanding and the additional soft costs, be advanced to Benitez to complete the rehabilitation of Westchase. Memo attached as Exhibit GG to Scott's Motion for Summary Judgment. In that memo, the officers informed the executive committee that Dunn Construction did not think that renovation was feasible, and Weaver thought renovation was feasible. *Id.* After evaluating all of the evidence presented, the officers recommended that the funds be advanced to complete the project. *Id.* Guthrie made a presentation to the Executive Committee[26] which included slides of the progress of the project and an explanation of its location. If the Executive Committee accepted this recommendation, the principal balance outstanding would be increased to $15,7775,000, which included the balance outstanding when Unifirst foreclosed in 1985, plus all funds advanced for the first phase of renovation, with accrued interest for over two years and soft costs.

At least one member of the committee, General Wilson, had personally visited the property on several occasions. Wilson met with Benitez and discussed the potential for the property if fully renovated. Wilson also independently concluded that the New Orleans economy was reviving. Furthermore, Wilson felt that he could use his influence to have military personnel at nearby naval facilities referred to Westchase for their apartment needs. During this time, President Reagan's 600–ship navy was being completed resulting in the revival of nearby shipyards. Navy personnel awaiting duty and those on leave needed suitable apartments. The housing officer at the naval base assured Wilson that his personnel would be directed to the apartments.

Several factors, other than the value of the property, contributed to the recommendation by the officers, including the widening of Manhattan Boulevard, the building of a Sam's Superstore, among other projects, and the building of the new Mississippi River bridge which would cut travel time from Westchase to downtown New Orleans to less than fifteen minutes. The recommendation also stressed that Benitez had been able to keep the renovated units 100% occupied, with a 40–person waiting list. Furthermore, Benitez agreed to personally guarantee the completion of the contract; that is, Benitez would be personally liable for any amounts over the estimated cost to complete the project.[27]

26. The RTC alleges that Guthrie was "coerced" into recommending that Unifirst advance the funds to complete the renovation of Westchase. There is no support in the record for this allegation. Guthrie testified that he had reservations about the Westchase project and that he voiced these reservations to his supervisor, Jeb Cloyd. Guthrie Dep. at 46. Guthrie stated: "Mr. Cloyd felt that we ought to proceed because the bank could not take the charge-off, and because he felt that if we did proceed and finish it, we would have an asset that was worth more than we had, and that eventually we could find some type of financing, whether it be bond financing or otherwise, to take us out." *Id.*

27. The RTC asserts that "the cash-flow analysis of the property presented to the Committee by David Guthrie demonstrated *on its face* that the property could not make the loan payments on the loans." Plaintiff's Response at 22. The Court notes that this is evidence that the Executive Committee knew that the loan was not a typical loan and that other sources of financing

As added protection for the advancement of more funds to Benitez, Unifirst employed R.J. Dansereau, Jr., AIA of Metairie, Louisiana, to provide inspections and draw reports on a bi-weekly basis. This control helped to assure that the work would be completed in a timely manner and that the quality of workmanship met the requirements of the contract.

Scott acknowledges that each of the Unifirst officers involved in this transaction had reservations about whether to proceed with the complete renovation of the project. However, two of the most important facts in this case, which the RTC admits, are as follows:

1. It is undisputed, and all witnesses in this case have confirmed emphatically, that countless man-hours and substantial expense were incurred to analyze Unifirst's best options before proceeding with complete renovation.

2. Because total renovation had been thoroughly analyzed, Unifirst's loan officers knew the cost of construction and the projected rentals from the renovated units.

Scott's Itemization of Facts at 25, ¶¶ 249–50. Both the Executive Committee and the full Board approved the advancement of the funds to complete the renovation of Westchase. The complete Executive Committee minutes and the written recommendation to the Executive Committee were attached to the minutes of the Board meeting approving the Westchase loan. Defendant Scott had one vote on the Executive Committee and the full Board for each of these decisions.

On May 25, 1988, Guthrie recommended that Unifirst advance $3,700,000 to Benitez for the purchase of the Westview Apartments across the street from Westchase. Guthrie made an oral presentation to the Executive Committee supported by a written memorandum explaining the advantages and disadvantages of making the loan. The advantages included the following:

1) the average per unit construction cost of both projects would be lowered;

2) Benitez could develop both projects under compatible federal rent subsidy programs;

3) the loan would include a guaranty by Benitez of the purchase money, with both projects cross-collateralized and cross-defaulted, with the result that Unifirst would gain the value of Westview as security for Westchase; and

4) the loan would guarantee that no incompatible developments existed in close proximity to Westchase which could reduce its property value.

May 25, 1988, Memorandum, attached to May 25, 1988, Minutes of Executive Committee Meeting, attached as composite Exhibit L to Scott's Motion for Summary Judgment.[28] The Executive Committee heard, reviewed and approved Guthrie's recommendation concerning Westview on May 25, 1988. Subsequently, on June 22, 1988, Scott made a report to the Board concerning the approval by the Executive Committee of the Westview loan. The full Board approved the report. June 22, 1988, minutes of the Board meeting, attached as composite Exhibit L to Scott's Motion for Summary Judgment.

On September 8, 1988, the Commercial Loan Officer's Committee met, and Sessions Roland recommended approval of a loan request from Thoreau Investment Corporation[29] to acquire the six remaining scattered lots within the Westview Apartments area. The Committee recommended to the Board Loan Committee that $715,000 be advanced

---

must be sought at some point to remove Unifirst from the project. The RTC agrees that because Unifirst committed to completely renovate the property, Benitez sold tax credits for $5,600,000, which funds were used to partially pay the RTC for the property.

**28.** The RTC admits that the listed items were contained in Guthrie's explanation to the Executive Committee, but alleges that "his recommendation was premised on his coerced recommendation with respect to Westchase." Plaintiff's Response to Itemization of Material Facts at 29, ¶ 321. As stated previously, the evidence does not support that Guthrie was "coerced" into doing anything. Furthermore, if Guthrie felt any pressure to recommend Westchase to the Executive Committee, it is clear that his supervisor, Cloyd, is the person who told Guthrie that Unifirst could not afford a loss on Westchase.

**29.** This corporation was another of Benitez' companies.

for the purchase of these lots. Sept. 8, 1988, minutes of the Commercial Loan Officer's Committee, attached as composite Exhibit L to Scott's Motion for Summary Judgment. On September 21, 1988, the Board Loan Committee approved the recommendation for Unifirst to advance $715,000 to Benitez for the purchase of these lots. Sept. 21, 1988, minutes of the Board Loan Committee, attached as composite Exhibit L to Scott's Motion for Summary Judgment.

The loan officers of Unifirst continued to analyze not only refinancing by tax-free bonds, but also the sale of tax credits, the use of block grants and other specialized financing mechanisms to pay off the Unifirst loans for Westchase and Westview. Months before the August 10, 1989, takeover of Unifirst by the RTC, Unifirst had commitments for the sale of tax credits. These committed proceeds were to be used to reduce the principal amount which Unifirst had loaned on this property. As noted previously, the $5.6 million obtained from the sale of these tax credits was used to pay the RTC after the takeover of Unifirst.[30]

During this entire period of time, Unifirst was being examined by the FHLBB and audited by Peat Marwick. It was not until the 1988 examination by the FHLBB examiner that the Unifirst procedures used in considering and approving the Westchase/Westview transactions were criticized. Stewart Report at 33. No formal investigations or enforcement proceedings regarding Unifirst were recommended to the FHLBB Office of General Counsel or Office of Enforcement during the entire period covered by the RTC Complaint. Furthermore, there was no criticism by Peat Marwick at any point of the Unifirst accounting procedures concerning the Westchase/Westview transactions. General Wilson, as the Chairman of the Board Audit Committee, arranged meetings between the outside directors on the Audit Committee and personnel from Peat, Marwick, so that the accountants could tell the outside directors any information outside the presence of management. Peat, Marwick

never raised any questions about any of the transactions involved in this case during those meetings.

It was during this period of time that Scott, and the other Unifirst officers, were recognized by the FHLBB as being quite capable:

Management is considered very strong in the operations area, attributable to its proficiency in the accounting function. President Scott is noted as being well versed in the establishment of branch offices that are well-managed and profitable; therefore, we believe that, in acquiring operations across state lines, President Scott would continue to strive to form efficient and capable management teams.

Stewart Report at 34 (quoting 5/5/88 Memorandum from Supervisory Agent Kielborn to Acquisition File).

The RTC took over Unifirst on August 10, 1989. After this takeover, Benitez and his companies obtained a release of the Unifirst loans by taking the following steps:

1) Paying the RTC $100,000 in cash from their own sources, along with $9,625,000 raised from refinancing and selling tax credits on Westchase;

2) Giving the RTC a note for $275,000.

Defendant's Itemization of Material Facts at 32, ¶ 352. In exchange for this payment, Benitez received a release of approximately $21 million which Unifirst had invested in this property, as well as a release of Benitez' personal guaranty of $4,770,000. Both properties have been more than 95% occupied since the RTC release. The properties have been marketed by Benitez as the "Miracle on Manhattan." Benitez' company received an award for the "best redevelopment in the country" for the completed Westview project by the National Association of Counties. The properties have continued to perform well, have exceeded all projections and remain the newest apartments on the West Bank. Juneau Dep. at 116–17.

30. The Court will address the other "take-out" financing obtained by Benitez in a subsequent portion of this opinion.

### E. *Scott's Counterclaim for Indemnification*

Scott asserts that applicable statutes, regulations and the bylaws of Old Unifirst require the indemnification of an officer or director of Unifirst when suit is brought against that person for actions taken in his official capacity if that officer or director receives a final judgment on the merits in his favor. *See* 12 CFR § 545.121; Bylaws of Unifirst at B–7, attached as Exhibit B to the June 27, 1984, Minutes. Scott further asserts that the Agreement between the RTC as receiver for Old Unifirst and New Unifirst transferred this indemnity obligation to New Unifirst. By Order dated April 18, 1995, this Court concluded that certain portions of the Agreement were ambiguous precluding summary judgment in favor of Scott at that time. April 18, 1995, Opinion and Order at 18–20. The Court will reconsider this ruling in light of the evidence which is now before the Court.

### II. *Summary Judgment Standard*

Rule 56 of the Federal Rules of Civil Procedure states in relevant part that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The United States Supreme Court has held that this language "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also Moore v. Mississippi Valley State Univ.*, 871 F.2d 545, 549 (5th Cir.1989); *Washington v. Armstrong World Indus.*, 839 F.2d 1121, 1122 (5th Cir.1988).

The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record in the case which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53. The movant need not, however, support the motion with materials that negate the opponent's claim. *Id.* As to issues on which the non-moving party has the burden of proof at trial, the moving party need only point to portions of the record that demonstrate an absence of evidence to support the non-moving party's claim. *Id.* at 323–324, 106 S.Ct. at 2552–53. The non-moving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553.

Summary judgment can be granted only if everything in the record demonstrates that no genuine issue of material fact exists. The district court, therefore, must not "resolve factual disputes by weighing conflicting evidence, ... since it is the province of the jury to assess the probative value of the evidence." *Kennett–Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir.1980). Summary judgment is improper where the court merely believes it unlikely that the non-moving party will prevail at trial. *National Screen Serv. Corp. v. Poster Exchange, Inc.*, 305 F.2d 647, 651 (5th Cir.1962).

### III. *Analysis*

#### A. *Gross Negligence Standard*

The parties agree that section 81–5–105 of the Mississippi Code defines the standard of care applicable to a bank officer or director and whether such a person may be held personally liable to a banking corporation or its successor for any alleged losses.[31] That statute provides in relevant part as follows:

A director or officer of a bank ... shall not be held personally liable to the corpo-

---

**31.** The parties have not submitted and the Court has not found any Mississippi cases interpreting this statute. The Court must therefore make an *Erie* guess concerning how the Mississippi Supreme Court would interpret this statute. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

ration or its successor ... for monetary damages unless the director or officer acted in a grossly negligent manner as defined in subsection (5) of this section or engaged in conduct which demonstrates a greater disregard of the duty of care than gross negligence, such as intentional tortious conduct or intentional breach of his duty of loyalty or intentional commission of corporate waste.

Miss.Code Ann. § 81–5–105(2) (Supp.1995). Scott asserts, and the RTC does not dispute, that there is no statutory provision which allows an officer or director to be held vicariously liable for any alleged gross negligence committed by other officers or directors. Thus, under the express language of the statute, Scott may be held liable only if his own acts or omissions rise to the level of gross negligence.

As previously noted, the only remaining claim in this matter is a claim for gross negligence. There are no allegations that Scott engaged in any intentional conduct or that he breached any duty of loyalty to Unifirst. This case is unlike many other RTC cases which were initiated due to the criminal wrongdoing, self-promotion, illegal pyramiding schemes or loans to family members by the named defendants. The RTC does include a section in its brief entitled "Defendant's Personal Interests in Avoiding Loss Recognition." Plaintiff's Response at 10–14. This section berates Scott for his "lifestyle" as the President of Unifirst and includes allegations that Scott entertained lavishly at Unifirst's expense; carried his wife on trips abroad; arranged for his son, Tom Scott, III, to obtain the job as general counsel for Unifirst; and received raises from 1985 through 1988 amounting to over $100,000. *Id.* As noted by Scott in his reply, the RTC failed to include any allegations of self-interest in the Amended Complaint. Memorandum of Authorities in Reply at 9. The Amended Complaint only contains allegations of alleged breaches of underwriting and management standards. *Id.* Thus, according to Scott,

any attempted amendment of the RTC allegations at this late stage should not be allowed.

The Court agrees that the RTC did not include any "self-interest" allegations in the Amended Complaint. Furthermore, the RTC did not make any formal request, by filing a motion to amend, to assert such allegations. Therefore, any attempt to rely on these allegations to support the instant motion will not be allowed. The Court notes, however, that the allegations asserted by the RTC amount to no more than a failed attempt to justify the initiation of this lawsuit against Scott. The RTC belief that Scott spent too much Unifirst money attending conferences and having lavish parties "equipped with butlers, maids and huge floral arrangements," Plaintiff's Response at 11, is not a sufficient reason to institute litigation and tax the resources of the Defendant and this Court.[32]

Because the only remaining claim in this matter is a claim for Scott's alleged gross negligence, the Court must determine the meaning of that phrase. The Mississippi statute setting forth the standard of care for bank officers and directors contains a definition for gross negligence:

> As used in this section, the term "gross negligence" means a reckless disregard of, or a carelessness amounting to gross indifference to, the best interests of the bank ... and involves a substantial deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances.

Miss.Code Ann. § 81–5–105(5) (Supp.1995). The statute also, to some degree, defines what is not gross negligence by setting forth the situations when a director of a bank will not be held liable for his official actions:

> A director of a bank ... shall, in the performance of his duties, be fully protected in relying in good faith on the records of the bank ... and in relying in good faith upon information, opinions, reports or

---

**32.** The Court also notes that initially this suit involved allegations of Scott's misconduct regarding two other very large transactions which the RTC has now abandoned apparently due to lack of sufficient evidence. Furthermore, Uni-

first did not fail because of the Westchase/Westview transaction, but for many other reasons, including other failed loans, for which no allegations of misconduct have been brought against Scott.

statements presented to him, to the bank . . ., to the board of directors or to any committee thereof by any of the bank's . . . officers or employees or by any committee of the board of directors, or by any counsel, appraiser, engineer or independent or certified public accountant selected with reasonable care by the board of directors or any committee thereof or by any officer having the authority to make such selection or by any other person as to matters the director in good faith believes are within such selected person's professional or expert competence, such person having been selected in good faith by the board of directors or any committee thereof or any officer having the authority to make such selection.

Miss.Code Ann. § 81–5–105(3) (Supp.1995). Thus, the RTC must present evidence which is sufficient to create a genuine issue of material fact concerning (1) whether Scott acted with gross negligence,[33] and (2) whether his actions constituted a substantial deviation below the standard of care expected of a reasonably careful person under like circumstances.

Even though the statute provides a "definition" for gross negligence, the parties do not agree concerning what this term actually means under Mississippi law. Scott asserts that gross negligence is an extreme and callous disregard for the interests of Unifirst such that Scott had no legitimate basis for taking the actions he did with regard to the Westchase/Westview transactions. Defendant's Memorandum of Authorities in Support at 7–8 (citing various cases which have interpreted the terms "reckless disregard" and "gross indifference" in other contexts). The RTC asserts that "the clear meaning of the statute is that a reckless, careless, or indifferent bank officer may be held liable when his conduct 'involves a substantial deviation below the standard of care' expected of bank officers." Plaintiff's Response at 40–41. The RTC further asserts that if Scott's definition of gross negligence is correct, the Mississippi statute, rather than defining gross negligence, attempts to abrogate the gross negligence standard set forth in 12 U.S.C. § 1821(k). *See* 12 U.S.C. § 1821(k);[34] *RTC v. Miramon,* 22 F.3d 1357, 1363 n. 9 (5th Cir.1994) (noting in dicta that state law cannot disallow an action for gross negligence, but declining to address the issue of "insulation [of an officer or director from liability] by forgiving state legislation"). The Court disagrees.

The Court finds that Mississippi, by employing the definition for gross negligence in Miss.Code Ann. § 81–5–105(5), has not enacted a statute which is contrary to federal law. The terms used to describe gross negligence, "reckless disregard" and "gross indifference," do not denote intentional or willful conduct, nor do these terms refer to conduct which is merely reckless or careless. The usages and connotations of these two terms is perhaps unlimited. For these purposes, however, these terms as used to define "gross negligence" do not describe a specific type of conduct but rather a range of conduct that lies somewhere between simple negligence and willful, intentional conduct:

> [E]ven though courts frequently speak as if simple and gross negligence were subject to simple and distinct classification and application, in truth there is no exact standard as to what conduct constitutes negligence or gross negligence in a given situation:
>
> > It is perhaps unnecessary to attempt to define with precision the degree of care and prudence which directors must exer-

---

**33.** In this regard, the RTC must create a genuine issue of material fact concerning Scott's good faith reliance on the reports and recommendations of other bank officers, Board members, counsel and any qualified experts. *See* Miss. Code Ann. § 81–5–105(3).

**34.** Section 1821(k) allows an officer or director of an insured depository institution to be held personally liable "for gross negligence, including any similar conduct or conduct that demonstrates a greater disregard of a duty of care (than

gross negligence) including intentional tortious conduct, as such terms are defined and determined under applicable State law." 12 U.S.C. § 1821(k). *See* June 8, 1995, Opinion and Order in this case for a complete discussion of the state and federal statutes and the interplay between federal and state law. According to the RTC, the Mississippi statute, as interpreted by Scott, seeks to abrogate liability for gross negligence, rather than define gross negligence.

cise in the performance of their duties. The degree of care required depends upon the subject to which it is to be applied, and each case has to be determined in view of all the circumstances. *Washington Bancorporation v. Said,* 812 F.Supp. 1256, 1265 (D.D.C.1993) (quoting *Briggs v. Spaulding,* 141 U.S. 132, 147, 11 S.Ct. 924, 929, 35 L.Ed. 662 (1890)).

The Court finds that Scott's definition of gross negligence essentially tracks the wording of the statute. The RTC definition, using such terms as reckless, careless and indifferent, is a thinly-veiled attempt to hold Scott to a simple negligence, rather than a gross negligence, standard. If this case were to proceed to trial, the Court would be required to instruct the jury using the precise language contained in section 81–5–105(5), and it could be considered error for the Court not to do so. *See FDIC v. Mijalis,* 15 F.3d 1314, 1319–20 (5th Cir.1994) (discussing propriety of gross negligence instruction under Louisiana law in bank director liability case regarding a statute substantially similar to the Mississippi statute).

■ The Mississippi statute, portions of which have been quoted at length previously, also defines, in general, the duty of care owed by an officer or director to a bank:

> Bank ... officers and directors shall be deemed to stand in a fiduciary relationship to their bank ... and shall discharge the duties of their respective positions in good faith and with that diligence, care, judgment and skill as provided in subsection (2) of this section. Nothing contained in this section shall derogate from any indemnification authorized by either state or federal law.

Miss.Code Ann. § 81–5–105(1) (Supp.1995). Prior to the enactment of this statute,[35] Mississippi allowed recovery of damages for a breach of the duty of care by an officer or director "that an ordinarily prudent person would reasonably be expected to exercise in a

like position and under similar circumstances...." *Omnibank v. United Southern Bank,* 607 So.2d 76, 84 (Miss.1992) (quoting *Principles of Corporate Governance,* § 4.01(a)). This standard is one of simple negligence which was subject to a well-settled common law defense known as the business judgment rule. *Id.* at 85. That rule is as follows:

> A director or officer who makes a business judgment in good faith fulfills the duty ... [of care] if the director or officer:
>
> (1) is not interested ... in the subject of the business judgment;
>
> (2) is informed with respect to the subject of the business judgment to the extent the director or officer reasonably believes to be appropriate under the circumstances; and
>
> (3) rationally believes that the business judgment is in the best interests of the corporation.

*Id.* (quoting *Principles of Governance,* § 4.01(c)). This standard is an objective one and should not be analyzed from the viewpoint of the particular officer or director involved. *Id.* Because *Omnibank* pre-dates the statute under consideration in this case, it provides a standard from which to begin an analysis of the statute. The Court notes, however, that the statute apparently was enacted, at least in part, to overrule the *Omnibank* standard. The Mississippi Supreme Court, in applying the new, statutory "gross negligence" standard, would be required to hold an officer or director to some standard greater than the one set forth in *Omnibank.* Thus, the statutory gross negligence standard requires a greater degree of proof by the RTC, as the Plaintiff in this matter, than the *Omnibank* simple negligence standard, as qualified by the business judgment rule.

### B. *Was Scott Grossly Negligent?*

■ The Court finds as a matter of law that regardless of the interpretation given to

---

**35.** The statute became effective from and after its passage on April 8, 1994. The stated purpose of the statute is as follows:

> AN ACT TO CLARIFY THE APPLICABLE STANDARD OF CARE AND LIABILITY WHICH DIRECTORS AND OFFICERS OF

> BANKS AND BANK HOLDING COMPANIES SHALL HAVE; TO DEFINE THAT STANDARD OF CARE; AND FOR RELATED PURPOSES.

1994 Miss.Laws ch. 645 (April 8, 1994).

Miss.Code Ann. § 81–5–105 by the Mississippi Supreme Court, the RTC has presented no genuine issues of material fact regarding Scott's alleged gross negligence under that statute. The RTC has made broad allegations but has failed to support these allegations with any concrete proof of Scott's alleged gross negligence.[36] The record is replete with examples of the care exercised by the Unifirst officers and directors in attempting to formulate a "workout" plan for the Westchase loan. Scott, with the Board of Directors, in attempting to maintain Unifirst as a going concern, felt that it was in the best interest of Unifirst not to declare a loss on Westchase, but rather to attempt to recover some, if not all, of the Unifirst investment in the project. They took a businessman's gamble by holding their cards and staying in the game. They could have chosen to stop any further Unifirst losses by folding and getting out of the game. However, if they had chosen that option, Unifirst would have no prospect of "winning the game" by recovering its investment in the property. They thought that Unifirst had a good hand, but that Unifirst could not win unless it stayed in the game. The events subsequent to the RTC takeover of Unifirst have proven that Scott and the rest of the directors at Unifirst were right in making the decisions to invest further in the Westchase/Westview properties.

In analyzing Scott's actions in this matter, the Court will set forth various portions of the record which directly contradict the assertions of the RTC. Because the evidence submitted by the parties is so vast, the Court will not attempt to set forth every supporting and dissenting opinion regarding the transactions in this case. The Court need not make such an attempt in order to find that Scott was not "grossly negligent" in voting to approve the loans at issue in this case. The Court need only conclude that Scott had legitimate reasons for voting to approve the Westchase/Westview series of transactions. In fact, even analyzing Scott's actions under the *Omnibank* standard, the Court finds that Scott's actions are protected by the business judgment rule as set forth in that case. Finally, the Court will address the RTC contention that the expert reports submitted by it are sufficient to create a genuine issue of material fact in this case.

Initially, the RTC has a proximate causation problem. Scott had only one vote on the Executive Committee and on the full Board. All of the Board of Directors were trying to keep Unifirst open. Scott, as the President of Unifirst, no doubt had considerable influence over the other members of the Executive Committee and the Board. Furthermore, the individual members of the Board probably listened very closely to Scott's preferences concerning how to vote on various loans. However, the Board consisted of very prominent and experienced businessmen who knew or should have known of their own personal liability with regard to serving on the Board of Unifirst. Wilson, as a member of the Executive Committee of the Board, went to New Orleans to view the property to independently determine whether he thought the Westchase loan should be declared a loss or worked out. Wilson also testified that Scott was not a "monopolizer of conversation" in the Board or Executive Committee meetings. Dep. of Wilson at 76. Even though Scott may have had influence over the Board, there is no allegation, much less any proof, that he forced any Board member or Executive Committee member to vote to approve the Westchase/Westview loans. Thus, Scott's one vote as an Executive Committee member and/or a Board member did not "make or break" the Westchase/Westview transactions and arguably could not be a basis for holding him liable for any alleged Unifirst losses on those loans.

The RTC faults Scott for his failure to require that appraisals be obtained on the properties prior to loaning any money to Benitez. However, the Unifirst officers involved, Cloyd and Guthrie, testified that they did not need an appraisal to tell them what

36. In numerous instances, the RTC has cited to exhibits which do not support the proposition for which they are asserted. Specifically, the RTC has often referred to deposition excerpts of various witnesses concerning their alleged conversations with Scott when such conversations were actually with his son, Scott, III. The RTC has offered no basis, and the Court has discerned none, for imputing the knowledge of Scott, III, regarding these transactions to his father.

they already knew, that the property would not appraise for the amount of money which was being loaned on it. The intention from the very beginning was for Benitez to obtain other sources of financing to pay off the Unifirst loans and take Unifirst out of the project. Dep. of Cloyd at 58; Dep. of Guthrie at 131–35. Furthermore, the FHLBB had loosened the requirements for the thrifts by the time that the initial loan was made to Benitez in March, 1987, specifically concluding that "the value of collateral should not be the sole determinant of asset valuation where, for example, the borrower has other resources for repayment against which the lender has legal recourse." Stewart Report at 23 (quoting 53 Fed.Reg. 338, 350 (1/6/88)). This relaxation of lending requirements, in conjunction with the encouragement of the FHLBB for thrifts to "work out" problem loans both support the decision of the Unifirst officers not to obtain an additional appraisal of the Westchase property prior to making the loans to Benitez.

The RTC also asserts that "[c]ompletion of proper underwriting prior to the issuing of the initial loans in March of 1987 would have allowed confirmation of what Sessions Roland later determined in the fall of 1987—that the property could not generate sufficient income to pay the debt service on Unifirst's loans." Plaintiff's Response at 19. The RTC ignores the fact that Scott, along with the other members of the Board and Executive Committee, knew that the loans "could not be repaid when due in one year from the net operating income of this dilapidated property; there was little to none." Scott's Motion at 25. As set forth in the minutes of the Executive Committee meeting approving the initial loans, "[i]t is the intent of the purchaser to seek financing through the issuance of tax exempt bonds as rehabilitation proceeds." March 18, 1987, Minutes

of Executive Committee, attached as composite Exhibit L to Scott's Motion for Summary Judgment.

The RTC asserts that bond financing of the Westchase project was a sham and was never a viable alternative for the Westchase project. The evidence submitted by Scott is to the contrary. The RTC states that Cloyd informed Scott that bond financing was never a viable alternative. The portion of Cloyd's deposition on which the RTC relies simply states that Cloyd did not see bond financing as an alternative that Unifirst could "bank on." Cloyd Dep. at 73. Furthermore, the developers, Benitez and Juneau, worked tirelessly to obtain bond financing by obtaining letters of inducement from the Louisiana Public Facilities Authority and expending substantial time and money calling upon local politicians, "from the governor on down," to obtain an allocation of tax-free bonds for the Westchase project. Juneau Dep. at 49; Benitez Dep. at 54–55.[37]

Benitez was also working with John Rucker at Frazer Lanier to obtain a purchaser for the bonds, and hundreds of man-hours were invested to close a tax-free bond issue for Westchase. Juneau Dep. at 47–49. The parties submitted a letter from Rucker to Benitez dated November 14, 1986, concerning the issuance of tax-free bonds. Rucker Letter, attached as Exhibit 34 to Plaintiff's Response. Again, the RTC mischaracterizes the testimony of Rucker concerning this letter. The RTC asserts that Rucker testified that "the terms outlined in his letter were simply the terms upon which typical non-rated tax exempt bonds were selling at the time and that it was nothing more than a contingency." Plaintiff's Response at 24. This was not his testimony at all:

> A: Oh, no. It's never a given. In fact, today it's very difficult to get that done. But back in 1987 and 88, that was the first step of a bond transaction that you had to go through, and while we always knew from what the State's leanings were toward and what they had done historically, you never really know that you're going to get a bond allocation until they're actually induced."
> Juneau Dep. at 26.

---

**37.** The RTC asserts that Juneau testified that "in 1986 so few bonds had been allocated for so many years that the allocation was in essence perfunctory." Plaintiff's Response at 24. This statement is yet another example of the RTC misstating the facts. The portion of Juneau's deposition to which the RTC refers states as follows:

> Q: Is it a given that bonds will be induced for any project just upon application?

Q: Was this a firm commitment on your part to provide tax exempt bond financing for this project?

A: I would describe it more as a contingent commitment.

Q: From looking at this letter, can you tell me were you talking about rated or unrated bonds?

A: These bonds would have been unrated.

Rucker Dep. at 12, attached as Exhibit N to Plaintiff's Response. In this portion of his deposition, Rucker does not even address what typical non-rated tax exempt bonds were selling for at the time and certainly does not state that the issuance of such bonds was "nothing more than a contingency." Rather, Rucker characterized the letter as a "contingent commitment" on the part of Frazer Lanier to issue such bonds if the terms could be worked out with Unifirst.

Finally, the RTC admits that "Benitez and Unifirst did turn to an exploration of tax exempt AAA rated bonds which might carry a lower interest rate." Plaintiff's Response at 26. The RTC then faults Scott for exploring this alternative because the rated bonds carried the same unfavorable conditions as the unrated bonds of the requirement of a letter of credit from Unifirst. Once again, the RTC fails to understand the legal standard which is applicable to this matter. The fact that Scott explored his options is evidence that he could not have been grossly negligent. Just because those options did not prove to be successful with regard to tax-free bond financing does not mean that Scott was grossly negligent for even attempting to obtain such financing for the Westchase property.

Finally, with regard to subsequent advances to complete the renovation of Westchase, the RTC asserts that no such advances should have been made and the property should have been sold for whatever Unifirst could obtain. The RTC ignores the fact that no buyers had been found to purchase the dilapidated property. Furthermore, the RTC admits the following two facts:

1. It is undisputed, and all witnesses in this case have confirmed emphatically, that countless man-hours and substantial expense were incurred to analyze Unifirst's best options before proceeding with complete renovation.

2. Because total renovation had been thoroughly analyzed, Unifirst's loan officers knew the cost of construction and the projected rentals from the renovated units.

Scott's Itemization of Facts at 25, ¶¶ 249–50. The evidence shows that the various officers at Unifirst studied, for eight months, the construction costs of proceeding with renovation and the New Orleans real estate market. These facts are simply inconsistent with the RTC allegations against Scott of gross negligence for his actions concerning the Westchase loans. The fact that there was a difference of opinion among the various contractors and appraisers, and in fact, some of the officers at Unifirst, about whether to proceed is immaterial to the present case.[38]

The RTC also takes issue with the approval of the loan to buy the Westview property across the street from Westchase. As noted previously in this opinion, *see supra* at 29, there were several advantages to financing the Westview property, not the least of which is that the two properties would be cross-collateralized and cross-defaulted and the Unifirst officers were able to obtain a personal guaranty from Benitez of $4,770,000 in exchange for making this loan. Therefore, the loan to Benitez to purchase Westview only improved the position of Unifirst with regard to the two properties. These stated reasons are sufficient bases for making these loans, regardless of whether Unifirst had an appraisal. As noted previously, the Westview property was also in a state of disrepair and undoubtedly would not appraise for the amount of money which was being loaned on

---

**38.** As noted by Wilson, there is always some dissension when a decision is being made. According to Wilson, the job of the Board was to review the recommendations presented to it, not "to be a[n] arbiter between the dissenting views of the staff." Wilson Dep. at 72. Wilson also noted Scott's unique role as an officer and a director, stating that Scott "did not interject himself [at Board meetings] because that was not his business to interject himself but to hear what they had to say. And so the staff made the presentations...." *Id.*

the property. For this reason, the Unifirst officers did not obtain an appraisal on Westview.

Finally, the RTC makes very vague allegations concerning various statutory and regulatory violations by Unifirst in making the loans which are the subject of this case. To counter these allegations, Scott has offered the affidavit of his expert, Rosemary Stewart, which addresses in detail each alleged violation and an explanation therefore. Stewart Report at 24–30. The RTC has not responded to this affidavit, therefore the affidavit is uncontested. Because the RTC has failed to respond, the Court presumes that the RTC has no response to counter the affidavit of Stewart. The RTC may not simply rely on the allegations in the pleadings but must go beyond the pleadings to designate "specific facts showing that there is a genuine issue of trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Because the RTC has failed to present any response, the Court accepts the uncontested affidavit of Stewart and finds that Scott is entitled to summary judgment on any claims based upon statutory or regulatory violations.

Furthermore, the RTC ignores the financial situation which Unifirst and other thrifts were facing during this time period. The Court has previously set forth the background of the savings and loan industry in section II. B. of this opinion and will not repeat those facts here. It is sufficient to note that the FHLBB, under directives from Congress, was constantly changing and loosening the regulations applicable to thrifts during this financial crisis period. Unifirst was under the scrutiny of FHLBB examiners and the independent accounting firm of Peat Marwick. Neither of these groups of people made any adverse findings with regard to the Westchase/Westview loans. As noted by Scott's expert in her report,

> The fact is that the FHLBB examined Unifirst in 1986 and 1987—after Manhattan became a scheduled item—and specifically reviewed this property but did *not* order an independent reappraisal, and did *not* adversely classify the asset under the 1985 classification rule. Both of these op-

tions were available to the FHLBB, but neither was done.

> In fact, it was not until the 1988 examination of Unifirst (which was not completed until 1989) that the FHLBB adversely classified the various Manhattan investments using the new classification of assets rule that became effective on 12/31/87 (as a result of CEBA).... This was the first time that the FHLBB determined that specific loss reserves were appropriate and directed them to be established by Unifirst. Unifirst established these reserves even before the FHLBB Supervisory Agent directed it to do so.

Stewart Report at 20–21. Further, in 1988, the FHLBB recognized Unifirst for its ability to work out problem loans and recommended Unifirst as a potential acquirer of other failed thrifts:

> Based on our analysis and knowledge of the Institution and its management, we believe that Unifirst should be strongly considered as an acquirer in future merger negotiations.
>
> . . . .

### Real Estate Workout Capabilities

> As stated, Unifirst has operated in the past and continues to operate, as a traditional thrift focusing its lending in the single-family residential mortgage area. Therefore, management has not had extensive opportunities to workout problem real estate developments; however, in the few real estate workouts that management has been required to perform, they have shown the capabilities to address the problems in a logical and efficient manner.

Stewart Report at 24 (quoting 5/5/88 Memorandum from Joel Kielborn to Acquisition File).

Finally, the RTC asserts that the experts reports submitted by it are sufficient to create a genuine issue of material fact concerning Scott's alleged gross negligence. The Court disagrees. The RTC submitted the expert reports of Dr. William Staats and Robert L. Hays, attached as Exhibits A and B to Plaintiff's Response. Neither report was sworn or verified as required by Rule

56(e),[39] and the Hays report was not even signed. As a result, Scott filed a Motion to Strike these reports as evidence in this matter. In his Motion, Scott asserts that because the reports are unsworn, they should not be considered as evidence. Memorandum in Support of Motion to Strike at 4 (citing *Duplantis v. Shell Offshore*, 948 F.2d 187, 191–92 (5th Cir.1991) (striking an unsworn letter from an expert as inadequate pursuant to Rule 56(e) and insufficient to defeat a motion for summary judgment)).[40] Scott also argues that portions of the reports should be stricken which contain conclusory opinions and speculative statements concerning Scott's state of mind at the time of the transactions in question in this case.

In response to this Motion, the RTC responded by obtaining and filing sworn affidavits from Staats and Hays attesting to the accuracy of their previously filed reports.[41] Thus, according to the RTC, the Motion to Strike is moot. The RTC also asserts that the expert reports contain information regarding the ultimate issue in this case, i.e., whether Scott was grossly negligent. As such, it contends, the reports are admissible pursuant to Rule 704(a) of the Federal Rules of Evidence which provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." The RTC further asserts the following:

> Comparing the actions, or in this case, inactions of the bank, with accepted and prudent banking practices, Dr. Staats and Mr. Hays both conclude that the *conduct at issue was a substantial deviation from the standard of care by which reasonable bankers would abide.*

Memorandum in Support of Response at 7 (emphasis added).

The Court finds that the reports of Staats and Hays should be stricken from the record on procedural grounds as improper and unsworn documents which are not to be considered as evidence pursuant to Rule 56(e) and the *Duplantis* holding. Furthermore, the RTC failed to seek permission from this Court to supplement and/or resubmit these insufficient reports as competent summary judgment evidence. Because the RTC has experienced counsel who should be familiar with the Federal Rules of Civil Procedure as well as the local rules of this Court, the Court finds that the reports should not be considered in this matter.

Alternatively, the Court finds that when considering the merits of these reports, they do not present sufficient evidence to create a genuine issue of material fact concerning Scott's alleged gross negligence for his actions regarding the Westchase/Westview properties. Both reports are permeated with the terms "reckless" and "careless." As the RTC asserts, both experts concluded that Scott substantially deviated from "the standard of care by which reasonable bankers would abide." Memorandum Brief in Opposition at 7. The Court has carefully reviewed both the Staats and Hays reports. In neither report does either expert attempt to define the standard of care to which Scott should be held. Rather, taking their cues from the RTC, both experts are attempting

---

**39.** Rule 56(e) provides in relevant part:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so response, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

**40.** The *Duplantis* court further held that the "unauthenticated letter is not the kind of evidence described in Rules 56(c) and 56(e), and it was therefore not the district court's duty to examine whether and how it might be reduced to acceptable form by the time of trial." *Duplantis*, 948 F.2d at 192.

**41.** The Court notes that although these affidavits were filed, they were not sent to the office of the undersigned for consideration as required by the Uniform Local Rules for the Northern and Southern Districts of Mississippi. However, the Court has obtained copies of these documents from the official court file.

to hold Scott to a simple negligence, rather than a gross negligence, standard. Both reports are attempting to present mere arguments which counsel for the RTC could present to a jury if this case were allowed to go to trial. *See Salas v. Carpenter,* 980 F.2d 299, 305 (5th Cir.1992). As noted previously in this opinion, the RTC misunderstands the standard of care which is applicable to Scott. All simple negligence claims against Scott have been previously dismissed. The reports of the RTC experts are completely devoid of any testimony concerning:

> (1) the applicable standards of care as to each banking transaction at issue and what those standards require; and
>
> (2) what Mr. Scott did, or did not do, that failed, in their opinions, to comply with that standard of care.

Scott's Memorandum in Support at 7–8. Absent any such testimony, the Court finds that the reports fail to create any genuine issue of material fact to preclude summary judgment in Scott's favor.

Scott has also filed a Motion to Strike Inadmissible Proof. Because the Court has considered the proof which Scott seeks to strike, that Motion should be denied.

### C. *Conclusion Regarding Scott's Alleged Gross Negligence*

Scott was an officer and director of Unifirst and in that capacity attempted to make decisions which were in the best interest of Unifirst. He was well informed, was not interested in any of the subject matter of the Westchase/Westview transactions and he rationally believed that the judgments he made were in the best interest of Unifirst. *See Omnibank,* 607 So.2d at 84.

The RTC has failed miserably in seeking to hold Scott liable for his alleged gross negligence with regard to the Westchase/Westview transactions. The RTC has failed to adhere to the Policy Statement of the FHLBB concerning the prosecution of officers and directors of failed thrifts which concluded that it was not the intent of the FHLBB to

> second-guess directors and officers who have exercised business judgment after due diligence and reasonable care in the performance of their duties. Officers and directors are not expected to be infallible, and the Board recognizes that errors in business judgment may occur. *Business judgment errors do not occasion FSLIC lawsuits.*

Stewart Report at 35 (quoting FHLBB Resolution No. 87–636 "Accountability of Directors and Officers; Policy Statement." 52 Fed.Reg. 22,682 (6/15/87)). Furthermore, the RTC has proceeded under a misguided definition of gross negligence, despite the clear language in the Mississippi statute to the contrary. Finally, the RTC has failed to offer supporting evidence for the broad allegations of Scott's misconduct set forth in its Amended Complaint.

On a final note, the Court notes that the cliche that "Hindsight is 20/20" is not applicable to this case. From all indications in the record, it appears that the RTC simply "dumped" the Westchase/Westview properties in what amounted to a fire sale. Benitez characterized the sale for $10 million for property worth nearly $23 million as "as good a real estate deal as the Louisiana Purchase...." Benitez Dep. at 133. General Wilson also noted the excellent deal that Benitez got from the RTC concluding that the millions made by Benitez "is some sort of self-satisfying thing for me because it proved that we're not as dumb as the RTC has tried to make us out to be." Wilson Dep. at 78. Finally, in the report of Geoffrey Simril submitted by Scott, Simril outlines the sources of new funds which were known at the time the RTC sold the Westchase/Westview properties to Benitez:

| | |
|---|---|
| Sale of tax credits (Westchase) | $ 5,390,000 |
| FNMA loan (Westchase) | $ 5,247,100 |
| Rehabilitation Block Grants | $ 2,331,551 |
| FHA insured tax exempt issue (Westview) | $ 3,514,200 |
| | $16,482,851 |

These figures do not take into account that Benitez was forced to obtain financing almost immediately to prevent being sued by the RTC. Given the time, Benitez was certain that he could have obtained even more mon-

ey at better interest rates. Benitez Dep. at 296. In light of all of these facts, it appears that Scott and the other officers and directors of Unifirst were correct in their decision to completely renovate the Westchase property and to lend the money for Benitez to buy the Westview property. It appears from the evidence that had the RTC held onto the property for just a short while longer, the entire Unifirst investment could have been recouped.

### D. *Indemnification*

■ Scott asserts that the applicable regulations, Unifirst bylaws and the provisions of the Agreement between the RTC as receiver for Old Unifirst and New Unifirst require that he be indemnified by the RTC if judgment on the merits in his favor is rendered by this Court. The RTC asserts that Scott did not act in good faith and is therefore not entitled to indemnification. Furthermore, the RTC, relying on the previous April 18, 1995, Opinion and Order of this Court, claims that genuine issues of material fact exist concerning whether the RTC as receiver for Old Unifirst intended to transfer the indemnification obligation to New Unifirst.

The applicable regulation provides as follows:

A Federal savings association shall indemnify its directors, officers, and employees in accordance with the following requirements:

    . . . .

(a)(2) References in this section to any individual or other person, including any association, *shall include legal representatives, successors, and assigns thereof.*

(b) General. Subject to paragraphs (c) and (g) of this section, a savings association shall indemnify any person against whom an action is brought or threatened because that person is or was a director, officer, or employee of the association, for:

    ·        ·        ·        ·        ·

(2) Reasonable costs and expenses, including reasonable attorney's fees, actually paid or incurred by that person in defending or settling such action. . . .

(c) Requirements. Indemnification shall be made to such [person] [42] under paragraph (b) of this section only if:

(1) Final judgment on the merits is in his or her favor. . . .

    . . . .

(f) Exclusiveness of provisions. No savings association shall indemnify any person referred to in paragraph (b) of this section or obtain insurance referred to in paragraph (d) of the section other than in accordance with this section. However, an association which has a bylaw in effect relating to indemnification of its personnel shall be governed solely by that bylaw, except that its authority to obtain insurance shall be governed by paragraph (d) of this section.

(g) The indemnification provided for in paragraph (b) of this section is subject to and qualified by 12 U.S.C. § 1821(k).

12 CFR § 545.121(a)(2), (b)(2), (c), (f) and (g). As allowed by subsection (f), Unifirst had a bylaw pertaining to indemnification of its employees:

*Officer and Director Indemnification—* Subject to the exceptions set forth herein, and the rules and regulations of the Federal Home Loan Bank Board, now codified at 12 CFR § 545.121, and such other applicable rules and regulations as the Bank Board may prescribe from time to time, the savings bank shall indemnify any person against whom an action is brought or threatened because that person was or is a director or officer of the savings bank, for: any amount for which that person becomes liable under judgment in such action; and for reasonable costs and expenses, including reasonable attorney's fees, actually paid or incurred by that person in defending or settling such action. However, such indemnification shall be made to such person only in (1) final judgment on the merits is in such person's favor. . . .

---

**42.** The regulation contains the word "period" instead of the obviously appropriate word "per-son."

Bylaws at B–7, attached as Exhibit B to the June 27, 1984, Minutes.

Relying on a district court case from Minnesota, the RTC asserts that indemnification is unavailable under the regulations or the Unifirst bylaws when the RTC sues an officer or director for wrongful conduct:

> Paragraph (b) of § 545.121, which provides for mandatory indemnification, is subject to paragraph (g). Paragraph (g) provides that indemnification by the savings association is subject to and qualified by 12 U.S.C. § 1821(k). Section 1821(k) provides for personal liability on the part of the directors in any civil action by the RTC acting as a receiver of an insured depository institution.
>
> Reading these provisions together, when the RTC sues the directors for their wrongful conduct against the institution, indemnification is simply unavailable.

*Adams v. RTC*, 831 F.Supp. 1471, 1478–79 (D.Minn.), *aff'd*, 10 F.3d 568 (8th Cir.1993). The RTC also asserts that the clear language of the regulation states that the savings association must be a going concern. *See also RTC v. Eason*, 17 F.3d 1126, 1134–35 (8th Cir.1994). The Court is not persuaded by these authorities.

The clear language of the regulation states that it applies to any "legal representatives, successors, and assigns" of a savings association. 12 CFR § 545.121(a)(2). Furthermore, the language in subsection (g) of the regulation does not create an exception to indemnity for suits brought pursuant to 12 U.S.C. § 1821(k). The plain language of that subsection, that indemnification is "subject to and qualified by 12 U.S.C. 1821(k)," indicates that a director or officer would not be entitled to indemnity if he loses a claim brought pursuant to section 1821(k). The cases cited by the RTC do not consider the language in subsection (a)(2) of the regulation or consider that a successful officer or director should be indemnified under the regulation.

Although there is no law in this circuit interpreting this regulation, there is precedent for treating the RTC and/or the FDIC just as any other party in a suit such as this. In *FDIC v. Ernst & Young*, 967

F.2d 166, 170 (5th Cir.1992), the court held that "the FDIC is not entitled to special protection when it brings a tort claim against a third party on behalf of a defunct financial entity." This Court relied on that language in granting the RTC Motion to Amend Complaint to substitute the FDIC as the party plaintiff in this matter noting that "the FDIC, as an assignee of the claims of the RTC, will be subject to the same affirmative defenses and counterclaims as was the RTC." April 29, 1996, Order at 3. The Court therefore finds that the RTC and/or FDIC are subject to the same indemnification provisions which were applicable to the failed institution because when the "FDIC acts as a receiver and liquidating agent for a failed bank, as it did here, it merely stands in the shoes of the insolvent bank." *Ernst & Young*, 967 F.2d at 170 (quoting *FDIC v. Harrison*, 735 F.2d 408, 412 (11th Cir.1984)). Thus, the RTC may not avoid its indemnification obligations based upon the indemnification regulations which were applicable to Unifirst.

Next, the RTC contends that New Unifirst did not agree to assume the indemnification obligations of Old Unifirst pursuant to the Agreement consummating the transfer of assets and liabilities. The pertinent portions of that Agreement are as follows:

> 2.1 *Liabilities Assumed.* The Assuming Association hereby expressly assumes at Book Value and agrees to pay, perform and discharge all of the following liabilities of the Failed Association which, in normal banking practice would be reflected on the books of the Failed Association, whether or not they are reflected on the books of the Failed Association as of Association Closing, and none other:
>
> . . . .
>
> (b) liabilities for indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other liens or indebtedness affecting or secured by any assets purchased by the Assuming Association pursuant to this Agreement, other than Tangential Loans; *provided, that* the assumption of any liability pursuant to this subpar-

agraph (b) shall be limited to the value of the assets securing such liability;

. . . .

3.1 *Assets Purchased.* The Assuming Association hereby accepts from the Receiver an assignment of, and the Receiver hereby sells, assigns, transfers, conveys and delivers to the Assuming Association, all right, title and interest of the Receiver in and to all of the following assets of the Failed Association (which shall be recorded at Book Value), which is based upon the best information available as of Association Closing and which shall be adjusted as provided in Article VI of this Agreement:

. . . .

(o) Action, judgment or claim of the Receiver against (a) any officer, director, employee, accountant, attorney, or any other Person employed or retained by the Failed Association on or prior to Association Closing arising out of any act or omission of such Person in such capacity. . . .

Purchase and Assumption Agreement ¶¶ 2.1(b), 3.1(o), attached as Exhibit D to the RTC Motion to Dismiss Scott's Counterclaim.

Scott previously argued that the language from paragraph 2.1(b) stating that New Unifirst would assume "liabilities for ... indebtedness affecting or secured by any assets purchased by" New Unifirst covers the indemnification obligation of Old Unifirst in favor of Scott. The RTC argued that the last sentence of ¶ 2.1(b) makes clear that the intent of the parties is that the subsection only pertains to a liability which is secured by a transferred asset.

In the previous ruling on this issue, the Court found that the language concerning the types of liabilities assumed as being the type which "in normal banking practice would be reflected on the books of the Failed Association" to be ambiguous. Upon reconsideration, the Court finds that the language of the Agreement is not ambiguous when all of the provisions are read together. The Court has located apparently the only case interpreting this exact provision, which case was not brought to the attention of the Court by either party before the Court ruled on the previous Motion to Dismiss Counterclaim. In *FDIC v. Marine Midland Realty Credit Corp.,* 17 F.3d 715, 720 (8th Cir.1994), the court interpreted the exact language which is at issue in this case.[43] The court held:

> Section 2.1(b) clearly says that the Assuming Bank (New Bank) assumes liability for indebtedness affecting any asset acquired by the Assuming Bank. If the intent was to assume only secured indebtedness, the carefully drafted provision would not have included the phrase "or indebtedness affecting."

*Id.* at 720. The Court noted that the FDIC has the power under 12 U.S.C. § 1821(d)(2)(G)(I), (II) to transfer any asset to a bridge bank[44] without transferring the accompanying liability. *Id.* However, the court concluded that "[g]iven the potentially inequitable nature of such a transfer, the power to so separate claims should only be permitted upon a perfectly clear intent to do so." *Id.*

Similarly, in this case, the Agreement should not be read as the RTC advocates or the phrase "or indebtedness affecting" contained in paragraph 2.1(b) would have no meaning. Furthermore, no other provisions of the Agreement evince an attempt by the RTC to limit the indemnification obligation of Old Unifirst. For this reason, the Court finds that the provisions of the Agreement are not ambiguous, and that the indemnification obligation was transferred from the RTC as receiver for Old Unifirst to New Unifirst. Thus, the RTC is obligated to indemnify Scott for his expenses and reasonable attorney's fees incurred in successfully defending this matter.

Alternatively, the Court finds that even if the Agreement is ambiguous, any ambiguity

---

43. Apparently, the Purchase and Assumption Agreement is a form agreement which the RTC uses when taking over failed institutions because the agreement language, as well as the paragraph number, is exactly the same in the *Marine Midland* case as in this case.

44. Bridge banks are created to assume assets and liabilities of failed insured banks. 12 U.S.C. § 1821(n) provides for their organization and operation. *Marine Midland,* 17 F.3d at 717 n. 1.

should be construed against the drafter, which is the RTC. *See Nicholas Acoustics & Specialty Co. v. H & M. Construction,* 695 F.2d 839, 843 (1983); *Banks v. Banks,* 648 So.2d 1116, 1121 (Miss.1994); *Kight v. Sheppard Bldg. Supply,* 537 So.2d 1355 (Miss. 1989). Thus, the provision may be interpreted to mean that the liabilities listed in paragraph 2.1 are the liabilities which would normally be reflected on the books of the failed savings and loan. Given this reading, the RTC would have transferred the indemnification obligation to New Unifirst pursuant to the Agreement.[45]

### IV. *Conclusion*

For the reasons set forth in this Opinion and Order, the Court finds that Scott is entitled to summary judgment because the RTC has failed to create any genuine issue of material fact to support its claim for gross negligence against Scott. The Court further finds that there are no genuine issues of material fact in regard to Scott's indemnification claim and that Scott should be indemnified for his expenses and reasonable attorney's fees incurred in successfully defending this action.

IT IS THEREFORE ORDERED that the Motion for Summary Judgment and for Partial Summary Judgment on Counterclaim should be and hereby is granted.

IT IS FURTHER ORDERED that the Motion to Strike Plaintiff's Expert Reports Submitted in Opposition to Scott's Motion for Summary Judgment should be and hereby is granted.

IT IS FURTHER ORDERED that the Motion to Strike Inadmissible Proof should be and hereby is denied.

A Final Judgment consistent with this Opinion and Order will be entered when the

Court has determined the amount of the award to Scott of expenses and attorney's fees.[46]

Scott is given until June 28, 1996, to file with the Court appropriate itemized statements and affidavits supporting his claim for expenses and attorney's fees in accordance with Rule 15(b) of the Uniform Local Rules for the Northern and Southern Districts of Mississippi. Plaintiff shall file its response by July 26, 1996. Scott shall file his rebuttal, if any, by August 9, 1996.

SO ORDERED.

**45.** The Court notes that in its previous Opinion and Order, the Court recognized that the RTC was the sole party to the agreement, although in two different capacities. Thus, any evidence to resolve the ambiguity would be in the possession of the RTC. April 18, 1995, Opinion and Order at 20 n. 1. It has been over one year since the entry of that Opinion and Order and the RTC has not offered any evidence to resolve the alleged ambiguity in the Agreement. Absent any such parol evidence, the Court is obligated to construe

the terms of the contract as written against the drafter. *See Nicholas Acoustics,* 695 F.2d at 843; *Kight,* 537 So.2d at 1358.

**46.** The Court notes that because the FDIC has been substituted as the party Plaintiff in this matter, it is also the counter-Defendant with regard to Scott's claim for indemnification and is thus liable for the payment to Scott of the expenses and attorney's fees as allowed by the Court.